# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SUSAN A. MORRO,

      **Plaintiff,**

    vs.                                                Civ. No. 17-501 KK

NANCY A. BERRYHILL,
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

     **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed August 2, 2017, in support of Plaintiff Susan A. Morro's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.  On October 2, 2017, Plaintiff filed her Motion to Reverse or Remand Administrative Decision and Memorandum Brief in Support ("Motion").  (Docs. 19, 20.)  The Commissioner filed a Response in opposition on December 1, 2017 (Doc. 22), and Plaintiff filed a Reply on December 15, 2017.  (Doc. 23.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

# I. Background and Procedural Record

Claimant Susan A. Morro ("Ms. Morro") alleges that she became disabled on July 30, 2013, at the age of thirty because of mental problems, pancreatitis, seizures, heart problems, right ovarian cyst, and liver problems. (Tr. 178, 182.[2]) Ms. Morro completed the ninth grade in 2000, and worked as a home healthcare provider. (Tr. 183.) Ms. Morro reported she stopped working on July 30, 2013, due to her medical conditions. (Tr. 182.)

On August 30, 2013, Ms. Morro filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 161-70.) Ms. Morro's application was initially denied on October 30, 2013. (Tr. 69, 70-83, 101-04.) It was denied again at reconsideration on June 19, 2014. (Tr. 84-99, 100, 108-113.) On July 2, 2014, Ms. Morro requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 114.) The ALJ conducted a hearing on November 16, 2015. (Tr. 35-68.) Ms. Morro appeared in person at the hearing with attorney representative Jeffrey Diamond. (*Id.*) The ALJ took testimony from Ms. Morro (Tr. 41-59), and an impartial vocational expert ("VE"), Thomas E. Bott (Tr. 60-66). On February 10, 2016, ALJ Matthew Allen issued an unfavorable decision. (Tr. 17-29.) On February 28, 2017, the Appeals Council issued its decision denying Ms. Morro's request for review and upholding the ALJ's final decision. (Tr. 1-6.) On April 28, 2017, Ms. Morro timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

# II. Applicable Law

## A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on August 2, 2017.

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform her past relevant work,

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

> the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.     Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion."

*Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## III. Analysis

The ALJ made his decision that Ms. Morro was not disabled at step five of the sequential evaluation. (Tr. 27-28.) Specifically, the ALJ determined that Ms. Morro had not engaged in substantial gainful activity since August 15, 2013. (Tr. 22.) He found that Ms. Morro had severe impairments of history of ovarian cysts, depression, anxiety, post-traumatic stress disorder (PTSD), intermittent explosive disorder, and history of substance abuse. (*Id.*) The ALJ also found that Ms. Morro had nonsevere impairments of hyperlipidemia, eczema, restless leg syndrome, headaches, mesenteric adenitis, acute pancreatitis, renal syndrome, and seizures.[4] (*Id.*) The ALJ, however, determined that Ms. Morro's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 23-24.) As a result, the ALJ proceeded to step four and found that Mr. Morro had the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except that she is

> limited to simple, routine, repetitive work. The claimant is limited to making simple work-related decisions. The claimant is limited to occasional interaction with supervisors, co-workers, and the public.

---

[4] The ALJ also discussed "claimant's alleged fibromyalgia" pursuant to SSR 12-2p and determined the medical evidence did not support any diagnosis of fibromyalgia. (Tr. 22-23.) Ms. Morro did not allege fibromyalgia in her application, but mentioned fibromyalgia during her administrative hearing testimony. (Tr. 53.)

(Tr. 25.) The ALJ further concluded at step four that Ms. Morro had no past relevant work. (Tr. 27.) The ALJ determined at step five that based on Ms. Morro's age, education, work experience, RFC, and the testimony of the VE, there were jobs that existed in significant numbers in the national economy that Ms. Morro could perform. (Tr. 27-28.)

In support of her Motion, Ms. Morro argues that (1) the ALJ improperly relied on VE testimony to conclude that jobs existed in significant numbers in the national economy that Ms. Morro could perform, and that Ms. Morro was capable of performing jobs requiring level one language development;[5] and (2) the ALJ's decision is contrary to and unsupported by substantial evidence within the record. (Doc. 20 at 2-11.)

For the reasons discussed below, the Court finds no reversible error.

A. **Step Five Findings**

When the disability analysis reaches step five of the sequential process, the burden shifts to the Commissioner to show that "there are sufficient jobs in the national economy for a hypothetical person with [the claimant's] impairments," *Jensen v. Barnhart*, 436 F.3d 1163, 1168 (10th Cir. 2005), "given her age, education, and work experience." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007); *see also* 20 C.F.R. §§ 416.960, 416.963-65 (explaining that a claimant's vocational factors of age, education, and work experience are considered, along with the claimant's RFC, to determine at step five whether there are a significant number of jobs that a claimant can perform). The Commissioner's showing must be supported by substantial evidence. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

To determine whether jobs exist in significant numbers, regulations require the Commissioner to take administrative notice of reliable job information from various

---

[5] Ms. Morro argues that her low intelligence, limited education and reading anxiety call into question her ability to perform *reasoning level one jobs*; however, the abilities cited in her argument refer to a job's required *language development* as that term is used in the DOT.

governmental and other publications. 20 C.F.R. § 416.966(d). Among the publications the regulations identify is the *Dictionary of Occupational Titles*, published by the Department of Labor.[6] 20 C.F.R. § 416.966(d)(1). The Commissioner may also use the services of a vocational expert or other specialist to determine whether a claimant's work skills can be used in specific occupations. 20 C.F.R. § 416.966(e); *see also Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished) (explaining that the whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof) (citing *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993)). An ALJ may properly rely on a VE's expert testimony, *Haddock v. Apfel*, 196 F.3d 1084, 1089 (10th Cir. 1999), but only when a claimant's impairments and limitations are adequately and precisely reflected in the hypothetical posed to the expert. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). "An ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert testimony as substantial evidence to support a determination of nondisability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999); *see also* SSR 00-4p, 2000 WL 1898704, at *4 (clarifying the ALJ's affirmative responsibility to ask about conflicts).

A claimant's education is a vocational factor that the ALJ considers at steps four and five, rather than an aspect of the RFC. *See Davidson v. Sec'y of Health & Human Servs.*, 912 F.2d 1246, 1253 (10th Cir. 1990) (explaining that vocational factors such as age, education and work experience, are combined with a claimant's RFC to evaluate what, if any, work a claimant is able to perform); *see also* SSR 96-8, 1996 WL 374184, at *1 (explaining that the RFC assessment

---

[6] Other publications include the *County Business Patterns*, published by the Bureau of Census; *Census Reports*, also published by the Bureau of Census; *Occupational Analyses*, prepared for the Social Security Administration by various State employment agencies; and *Occupational Outlook Handbook*, published by the Bureau of Labor Statistics. 20 C.F.R. 416.966(d)(2)-(5).

considers only functional limitations and restrictions that result from an individual's medically determinable impairments and related symptoms). "*Education*" is primarily used to mean formal schooling or other training, but past work experience, daily activities, hobbies, and the results of testing may also show intellectual ability. 20 C.F.R. § 416.964(a). The Administration uses certain categories to evaluate a claimant's level of education and, absent contradictory evidence, will use the numerical grade level completed to determine a claimant's educational abilities.[7] 20 C.F.R. § 416.964(b).

### 1. The ALJ Met His Burden at Step Five Demonstrating That Jobs Existed in Significant Numbers in the National Economy That Ms. Morro Could Perform

Ms. Morro first argues that the ALJ failed to resolve a conflict between the VE's testimony and the DOT and improperly concluded that jobs existed in significant numbers in the national economy that she could perform. Ms. Morro explains that the ALJ, based on VE testimony, ultimately identified two jobs that she could perform - the job of a final assembler, DOT code 735.687-018, and the job of a stone setter, DOT code 735.687.034, and thereby directed a finding that Ms. Morro was not disabled. (*Id.*, Tr. 28.) Ms. Morro asserts, however, that the DOT code the VE cited at the administrative hearing for the job of final assembler, *i.e.,* DOT code 783.687-018, is not the correct DOT code. (Tr. 63.) As such, Ms. Morro asserts that there was a conflict between the VE testimony and the number of jobs he identified which the ALJ failed to resolve and improperly relied on to find her not disabled at step five. (Doc. 20 at 2-5.) Ms. Morro goes on to assert that because the ALJ erroneously relied on the VE testimony regarding the final assembler job, it must be eliminated from the ALJ's findings, and that her

---

[7] The categories include (1) illiteracy; (2) marginal; (3) limited; and (4) high school education and above. 20 C.F.R. § 416.964(b)(1)-(4).

denial of benefits is, therefore, only supportable if the one remaining job of stone setter exists in significant numbers. (*Id.*) Ms. Morro contends that it does not. (*Id.*)

The Commissioner argues that the VE merely cited the DOT code number incorrectly at the administrative hearing, and that upon review she was only off by one digit – that she cited DOT code 783.687-018, which corresponds with a "hide inspector," but meant to cite DOT code 713.687-018, which correctly corresponds to a final assembler. (Doc. 22 at 15.) The Commissioner further argues that the DOT code for final assembler is consistent with the VE's testimony because the job of final assembler is unskilled and complies with the ALJ's RFC assessment. (*Id.*) Because there was no conflict to resolve, the Commissioner contends that the two jobs the ALJ relied on at step five, in the aggregate, constitute a significant number of jobs. For these reasons, the Commissioner asserts that the ALJ reasonably relied on the VE's testimony to find that Ms. Morro was not disabled at step five. (*Id.*)

Here, the ALJ utilized VE Thomas Bott to determine whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (Tr. 20.) The ALJ presented the VE with three hypotheticals. (Tr. 60-63.) Based on the ALJ's second hypothetical,[8] the VE identified one light exertional level job, and two sedentary exertional level jobs that Ms. Morro could perform, identified their DOT numbers, and testified, based on his professional experience and reliance on the Occupational Employment Survey,[9] regarding the number of available jobs in the national economy as to each of them. (Tr. 62-63.)

---

[8] "Assume an individual of the claimant's age and education and with no past relevant work. Further assume the individual is limited to light exertional level work. The individual would also be limited to simple, routine, repetitive work []. The individual would also be limited [to] work related decisions and only occasional interaction with supervisors, co-workers and the public." (Tr. 60, 62.)

[9] The VE testified that he was using the "Occupational Employment Survey as it's programmed into a computer program called the Job Browser Pro by the SkillTran Company[,]" and that it was capable of making mathematical estimates of employment in the United States and in New Mexico. (Tr. 61.)

When questioned, the VE affirmatively stated that his testimony was consistent with the DOT. (Tr. 65.)

The ALJ properly relied on the VE testimony and there was no conflict for the ALJ to resolve. The Court is persuaded that the VE's incorrect citation to one digit of the DOT code for the job of final assembler was a technical error that is minor enough not to undermine the Court's confidence in the ALJ's step five findings. *Gay v. Sullivan*, 986 F.2d 1336, 1341 n. 3 (10th Cir. 1993). Although the VE incorrectly cited DOT code number 783.687-018, instead of 713.687-018, the VE nonetheless described the job as "final assembler in the optical industry." (Tr. 63.) The ALJ, in turn, similarly identified the job of "final assembler" as one of the two jobs he relied on at step five to determine that Ms. Morro was not disabled. (Tr. 28.) Thus, the Court is persuaded that despite the incorrectly cited DOT code, the VE identified, described and discussed the job of final assembler, which the ALJ properly relied on in making his step five findings. Between the final assembler and the stone setter jobs, the VE identified 52,429 nationally available jobs in the aggregate, a number well above the 11,000 nationally available jobs the Tenth Circuit has previously implied constitutes a significant number. *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished). The ALJ, therefore, properly determined that jobs existed in significant numbers in the national economy that Ms. Morro could perform.

In short, because there was no conflict to resolve between the VE testimony and the DOT regarding whether jobs existed in significant numbers in the national economy that Ms. Morro could perform, and because the ALJ properly relied on the VE's testimony regarding the number of available jobs, there is no reversible error as to this issue.

## 2. The Jobs the VE Identified Properly Accounted for Ms. Morro's Limited Education

Ms. Morro next argues that the ALJ failed to resolve a conflict between the VE testimony and DOT with Ms. Morro's low intelligence, limited education and reading anxiety. (Doc. 20 at 5-7.) In support, Ms. Morro explains that the ALJ's mental RFC and the VE's testimony failed to account for her low intelligence, limited education, and reading anxiety, and that she does not have the ability required to perform even level one reasoning jobs.[10] (*Id.*) She further explains that the jobs the VE identified have reasoning levels of one and require an ability to recognize the "meaning of 2,500 (two or three-syllable) words[;] [r]ead at a rate of 95-120 words per minutes[; and] [c]ompare similarities and differences between words and between series of numbers." (*Id.*) The Commissioner contends the ALJ expressly took into account Ms. Morro's limited education in making his step five findings and there is no apparent conflict for the ALJ to resolve in this regard. (Doc. 22 at 15-17.)

As an initial matter, Ms. Morro appears to misunderstand the relevant regulation and publication when she argues that her low intelligence, limited education and reading anxiety call into question her ability to perform *reasoning level one jobs*. Indeed, the abilities cited in her argument refer to a job's required "language development" as that term is used in the DOT.[11] Parsing out her argument then, it would appear that Ms. Morro believes that the jobs the VE

---

[10] *See* fn. 6, *supra*.

[11] "General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study. The GED Scale is composed of three divisions; Reasoning Development, Mathematical Development, and Language Development." Dictionary of Occupational Titles – Appendix C – Components of the Definition Trailer, 1991 WL 688702 (2008). *Language Development Level 1 requires: Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minutes. Compare similarities and differences between words and between series of numbers.* Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. Speaking: Speak simple sentences, using normal word order, and present and past tenses. *Id.* (emphasis added).

identified require "language development" at a level higher than her low intelligence, limited education and reading anxiety allow. As further discussed herein, the Court is not persuaded that Ms. Morro's low intelligence, limited education and reading anxiety precluded her ability to do level-one reasoning jobs. The ALJ accounted for Ms. Morro's mental impairments in his RFC and limited Ms. Morro's work-related mental activities to simple, routine, repetitive work, simple work-related decisions, and occasional interaction with supervisors, co-workers, and the public. (Tr. 25.) The two jobs the VE identified and the ALJ relied on at step five have reasoning levels of one; *i.e.,* apply commonsense understanding to carry out simple one- or two-step instructions. Dictionary of Occupational Titles – Appendix C – Components of the Definition Trailer, 1991 WL 688702 (2008). The Tenth Circuit has held that even level-two reasoning jobs are consistent with the ability to do simple and routine work tasks. *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). And Ms. Morro has not cited to any authority to support an argument that the ALJ's mental RFC is inconsistent with level-one reasoning.

The ALJ asked about Ms. Morro's education as he was required to do. (Tr. 41-43); *see* 20 C.F.R. § 416.964(b)(6). Ms. Morro testified that she was in school until the ninth grade[12] and left "mid-drift."[13] (Tr. 41-42.) She testified that she attended special education classes while in school to receive extra help in concentration and writing, and that she had not obtained her GED. (Tr. 42.) She testified that while she has problems with reading and writing, her problems have more to do with concentration. (Tr. 42-43.) She testified that she can read the newspaper, and the words, for maybe five minutes, but that after that she gets "bored with it." (Tr. 43.) The

---

[12] *See* 20 C.F.R. § 416.964(b)(3) (explaining that the Administration generally considers that a 7th grade through 11th grade level of formal education is a limited education and presumes an ability in reasoning, arithmetic, and language skills, but not enough to allow a person to do more complex job duties needed in semi-skilled or skilled jobs).

[13] Ms. Morro reported to State agency examining psychological consultant Marianne Westbrook, Ph.D., that she left high school in ninth grade because she gave birth to her son. (Tr. 277.)

record further supports that Ms. Morro similarly reported to the Administration that she completed the ninth grade, but that she attended special education only from 1999-2000.[14] (Tr. 183.) The record further demonstrates that Ms. Morro reported to the Administration that she was able to read and write in English; that she enjoys, *inter alia*, playing "word search" and computer games (puzzles especially); that she can pay bills and count change; and that she goes to the library on a regular basis. (Tr. 181, 194, 233-34, 276.) Finally, the record demonstrates that State agency examining psychological consultant Marianne Westbrook, Ph.D., estimated Ms. Morro's intelligence to be in the low average range.[15] (Tr. 278.)

The ALJ properly relied on the VE testimony and there was no conflict for the ALJ to resolve. The ALJ's hypotheticals to the VE included limitations related to Ms. Morro's mental (and physical) impairments,[16] and directed the VE to consider Ms. Morro's vocational factors of age and *education*, as well as absence of past relevant work, when testifying about work Ms. Morro could perform. (Tr. 60.) The Court finds that the VE reasonably presumed that Ms. Morro had some ability in reasoning, arithmetic, and language skills commensurate with a limited education in light of Ms. Morro's testimony and the uncontradicted record evidence regarding her formal education up to the ninth grade, along with her testimony and

---

[14] Ms. Morro reported to healthcare providers in 2008 that she was in special education in elementary school and was told she had a reading disability. (Tr. 828.)

[15] Dr. Westbrook did not administer any intelligence testing. Further, the ALJ determined at step two that Ms. Morro had mental impairments of depression, anxiety, post-traumatic stress disorder, intermittent explosive disorder, and history of substance abuse. (Tr. 22.) Ms. Morro has not disputed the ALJ's step two findings, nor has she argued that her low intelligence is evidence of an intellectual disability that the ALJ failed to consider at step two. At step three, the ALJ considered Ms. Morro's mental impairments, singly and in combination, and determined that she did not have a mental impairment that met the listing criteria of listings 12.04 - *Affective Disorders*, 12.06 - *Anxiety Related Disorders,* or 12.09 - *Substance Addiction Disorders*. (Tr. 23.) Ms. Morro has not disputed the ALJ's step three findings. (Tr. 23-24.)

[16] Based on the record evidence and medical source opinion evidence, the ALJ assessed that Ms. Morro's mental impairments limited her ability to do work-related mental activities to simple, routine, repetitive work, simple work-related decisions, and occasional interaction with supervisors, co-workers, and the public. (Tr. 25.) The ALJ included these mental limitations in his hypotheticals to the VE. (Tr. 60-63.)

uncontradicted record evidence regarding her ability to read. *See* 20 C.F.R. § 416.964(b)(3). Moreover, the VE identified two jobs, which the ALJ subsequently relied on, that require the *lowest level* of language development as set forth in the DOT.[17] Thus, Ms. Morro's argument that the ALJ failed to resolve a conflict between the VE testimony and the DOT because the job identified were inconsistent with Ms. Morro's low intelligence, limited education, and reading anxiety is without merit. Finally, the Tenth Circuit, although not directly addressing the question of what levels of language development are consistent with simple, routine, repetitive work, as is the case here, held in an unpublished case that an RFC limiting a claimant to unskilled work involving simple and repetitive tasks included the "lowest educational profile." *See Davison v. Colvin*, 596 F. App'x 675, 682 (10th Cir. 2014) (rejecting a claimant's argument that the ALJ's RFC limiting him to unskilled work failed to account for his borderline intellectual functioning and alleged illiteracy because the RFC included the lowest language development of one). As such, the Court is persuaded that the ALJ's mental RFC limiting Ms. Morro to simple, routine, repetitive work included the lowest language development and accounted for Ms. Morro's low intelligence, limited education, and reading anxiety. *Id.*

The Court finds that Ms. Morro has failed to present any evidence that there was a conflict between the VE testimony and the DOT regarding her low intelligence, limited education and reading anxiety. The Court further finds that the jobs the VE identified and the ALJ relied on in his step five findings properly accounted for Ms. Morro's low intelligence, limited education and reading anxiety. As such, there is no reversible error as to this issue.

---

[17] *See* fn. 9, *supra; see also* DOT 713.687-018, Final Assembler (optical goods) – L1, and DOT 735.687-034, Stone Setter (jewelry-silver) – L1.

### B.       Substantial Evidence Supports the ALJ's Determination

Ms. Morro broadly argues that the ALJ's decision is contrary to and not supported by substantial evidence.  In support, she asserts (1) that the ALJ failed to assign proper weight to the medical opinions and "other sources"; (2) that the ALJ failed to properly weigh State agency examining psychological consultant Dr. Westbrook's opinion; and (3) that the ALJ failed to properly account for Ms. Morro's pain and other symptoms.  (Doc. 20 at 7-12.)

### 1.       Evaluation of Medical Evidence

Ms. Morro argues that the ALJ substituted his own lay opinion and disregarded medical opinions in the record, regarding the severity of and pain associated with her ovarian cysts to determine that she was not disabled.  (Doc. 20 at 7-9.)  Ms. Morro also argues that the ALJ failed to give proper weight to State agency examining psychological consultant Marianne Westbrook, Ph.D.'s opinion.  (*Id.* at 1-10.)  The Commissioner contends that the ALJ properly evaluated the medical evidence, properly accorded great weight to the State agency nonexamining psychological consultant opinions and some weight to Dr. Westbrook's opinion, and that the ALJ's findings were supported by substantial evidence.  (Doc. 22 at 11-14.)

### a.       Relevant Medical Evidence

### (1)       Lea Regional Medical Center

On July 30, 2013, Ms. Morro presented to Lea Regional Medical Center with complaints of epigastric and right upper quadrant abdominal pain.  (Tr. 285-86.)  She reported a history of stroke and seizures, for which she took no medications, and a heart attack at age 23 without subsequent treatment.[18]  (Tr. 285.)  She reported smoking three packs of cigarettes per day with no plans to quit, and a history of heavy drinking, although only drinks occasionally now, but

---

[18] Elsewhere Ms. Morro reported having had a heart attack at age 10.  (Tr. 325, 897.)

admitted to drinking that day.[19]  (Tr. 283, 285.)  Ms. Morro was admitted and radiologic studies demonstrated mesenteric adenitis with fecal stasis and a 5 cm. right ovarian cyst.  (Tr. 303.) Ms. Morro was also diagnosed with chemical pancreatitis, likely alcohol induced.  (Tr. 284.)  An ultrasound of Ms. Morro's abdomen was "unremarkable," and a two dimensional echocardiogram demonstrated "nothing significant."  (Tr. 303.)  Ms. Morro was treated with morphine and Toradol for pain, and antibiotics for the mesenteric adenitis.  (Tr. 303, 307.) Gynecological consultant Kathleen Callaghan, M.D., determined the cyst was benign and stable, with no evidence of torsion or tubo-ovarian abscess.  (Tr. 301, 307.)  She planned to have Ms. Morro continue on pain medications and instructed Ms. Morro to follow up in her office in 4 to 6 weeks for a repeat pelvic ultrasound.  (Tr. 307.)  Dr. Callaghan indicated that if the cyst continued to be symptomatic or increased in size, Ms. Morro would be a candidate for diagnostic laparoscopy.  (*Id.*)  At discharge on August 1, 2013, Ms. Morro was "feeling fine."  (Tr. 301.) She was instructed to arrange for a primary care physician and to refrain from smoking and drinking.  (Tr. 303.)

### (2)    August 2013 through August 2014

Ms. Morro did not immediately arrange for a primary care provider or follow up with Gynecologist Dr. Callaghan as she was instructed.  Instead, over the next year, Ms. Morro presented nine times to various urgent and emergency care providers and sought pain medication for her complaints of abdominal pain.

On August 13, 2013, she presented to Covenant Health System in Lubbock, Texas, with concerns about increased pain.  (Tr. 746.)  She was observed to "show no signs of distress."  (*Id.*) Healthcare providers administered IV fluids, her condition improved, and she was discharged. (Tr. 751.)

---

[19] Elsewhere Ms. Morro reported smoking since age 8 and up to ten packs of cigarettes per day.  (Tr. 1101.)

On four different occasions she returned to Lea Regional Medical Center with complaints of abdominal pain.  (Tr. 421-30, 448-53, 460-61, 711-16.)  Treatment notes from those visits indicate that on August 24, 2013, ER physician Fahad Inam, M.D., noted that he doubted the severity of Ms. Morro's pain because she was comfortable, with no signs of distress, her heart rate was in the 50s, and she would go down to smoke and come back up asking for pain medication.  (Tr. 423, 429.)  On October 4, 2013, ER treatment notes indicated that although Ms. Morro alleged pain of 10/10, she was observed to be in only mild distress.  (Tr. 449.)  Similarly on March 1, 2014, she was observed to be in mild distress.  (Tr. 460.)  On August 14, 2014, Ms. Morro complained of 10/10 pain, but was observed to be in no acute distress and physical exam demonstrated "soft, moderate abdominal tenderness."[20]  (Tr. 711-12.)  Radiologic studies were normal; *i.e.,* no acute findings for gallstones, mesenteric adenitis, appendicitis or pancreatitis.  (Tr. 712.)  At each of these ER visits, Ms. Morro was discharged with narcotic pain medication.[21]

Ms. Morro also presented to Nor Lea General Hospital three times between August 2013 and August 2014.  (Tr. 836-37, 844-45, 852-53.)  On February 1, 2014, ER Physician James McQueen, M.D., noted that Ms. Morro was seen frequently for chronic pain in the ER and also other ERs around the area because she had no primary care physician or gynecologist.  (Tr. 836.)  On May 7, 2014, ER Physician Bharath Karnati, M.D., noted that Ms. Morro was in no acute distress, that she was sitting comfortably in the chair, laughing with her family members, and that her abdominal exam was totally benign.  (Tr. 844.)  On June 18, 2014, ER physical exam

---

[20] The ER physician noted that Ms. Morro "has a history of mental illness," and that she reported having a very large ovarian cyst and that her condition was terminal.  (Tr. 711.)  On physical exam, the ER physician noted, *inter alia*, that Ms. Morro was anxious and angry, but that she was oriented to person, place, time, and situation.  (Tr. 712.)  At discharge, notes indicated that Ms. Morro had "no cognitive and/or functional deficits."  (Tr. 716.)

[21] Percocet (Tr. 430), Hydrocodone (Tr. 450), and Tramadol (Tr. 462, 713).

notes indicated that Ms. Morro had some upper and lower abdominal tenderness.  (Tr. 852.)

Ms. Morro was discharged with narcotic pain medication after two of the ER visits.[22]

### (3) American Medical Group - 2014

#### (a) Brock W. Morris, CFNP

On September 15, 2014, Ms. Morro presented to Brock W. Morris, CFNP, of American Medical Group, seeking referrals for specialized care.  (Tr. 577-79.)  CFNP Morris conducted a physical exam and assessed, *inter alia*, pelvic pain, ovarian cyst, chest pain, anxiety and depression.  (Tr. 578-79.)  His treatment notes indicated that he discussed with Ms. Morro that pain medications would be limited due to her not being in pain management.  (Tr. 579.)  CFNP Morris referred Ms. Morro to Marianne Westbrook, Ph.D., for anxiety, depression and history of mood disorder; he referred Ms. Morro to a cardiologist for a reported abnormal EKG; and referred her to OB/GYN for her ovarian cyst and pelvic pain.  (*Id.*)  He prescribed hydrocodone for pain.  (*Id.*)

Ms. Morro saw CFNP Morris eight more times in 2014 for various lab results and assorted complaints including pelvic/abdominal pain, sore throat and rashes.  (Tr. 536-39, 545-48, 548-52, 552-55, 563-67, 567-70, 570-74, 574-76.)  CFNP Morris's physical exam notes consistently demonstrated that Ms. Morro was healthy-appearing, well-nourished, and well-developed.  (Tr. 538, 548, 551, 554, 566, 569, 573, 576.)  They also noted his observation that Ms. Morro frequently presented with only mild distress (Tr. 551, 554, 566, 569, 573, 576), and occasionally presented with moderate distress (Tr. 538, 548, 559).  Physical exams consistently indicated suprapubic tenderness (Tr. 538, 548, 551, 554, 566, 570, 573, 576.)  CFNP Morris prescribed hydrocodone for Ms. Morro's complaints of pain.  (Tr. 539, 548, 554, 570, 573, 576.)

---

[22] Demerol (Tr. 836, 853).

Notably, Ms. Morro was referred to oncologist/hematologist Ajaz Bulbul, M.D., on October 16, 2014, following abnormal blood work results. (Tr. 900-903.) Dr. Bulbul diagnosed Ms. Morro with secondary polycythemia related to hypoxia with plasma volume contraction from chronic smoking. (*Id.*, Tr. 905, 914, 917, 921.) Dr. Bulbul recommended daily aspirin and increased fluid intake, and advised Ms. Morro that she needed to quit smoking. (Tr. 902, 905, 908, 917.) Dr. Bulbul continued to follow Ms. Morro monthly for regular blood work. (Tr. 904-06, 907-09, 910-12, 913-15, 916-18, 919-21.) He consistently observed she was in no acute distress and that her abdomen was nontender on physical exam. (Tr. 902, 905, 908, 911, 914, 917, 920.)

Ms. Morro also saw Gynecologist Christopher Driskill, M.D., on November 5, 2014, at Nor Lea General Hospital, for consultation regarding possible diagnostic laparoscopy and aspiration or removal of her right ovarian cyst. (Tr. 859.) Dr. Driskill noted that Ms. Morro was in no apparent distress and had an unremarkable abdominal exam. (Tr. 860.) Dr. Driskill planned to request Ms. Morro's radiologic studies before proceeding, but noted that Ms. Morro indicated that her pain was so unbearable she wanted the diagnostic laparoscopy regardless. (*Id.*) Dr. Driskill planned to move forward (*id.*), but a November 21, 2014, treatment record by CFNP Morris indicated that Ms. Morro reported that she needed a new gynecology referral "due to problems with Dr. Driskill." (Tr. 554.) Ms. Morro was subsequently referred to Texas Tech Physicians.[23] (Tr. 542.)

---

[23] *See* Section III.B.1.a.(4), *infra.*

### (b)     **Marianne Westbrook, Ph.D.**

On October 29, 2014, Ms. Morro saw Marianne Westbrook, Ph.D., with complaints of malaise and fatigue.[24] (Tr. 560-63.) At intake, Ms. Morro reported that she had bipolar disorder and seven different personalities. (Tr. 561.) She also reported she was in the clinic for anger issues, anxiety and depression. (*Id.*) Ms. Morro provided a history of childhood sexual abuse and current stress due to family living with her. (*Id.*) She described sleeping throughout the day. (*Id.*) Ms. Morro said she did not have a job due to her aggressive behavior and panic attacks. (*Id.*) On physical exam, Dr. Westbrook noted that Ms. Morro was healthy-appearing, well-nourished, well-developed, and overweight. (Tr. 562.) Dr. Westbrook noted Ms. Morro demonstrated moderate distress. (*Id.*) On mental status exam, Dr. Westbrook noted that Ms. Morro was oriented to time, place, and person; had motoric restlessness; was anxious and depressed; had good eye contact; relevant, logical and coherent speech with normal rate, tone, and volume; normal thought process and associations; adequate language; normal recent and remote memory; and that her fund of knowledge was intact. (*Id.*) Dr. Westbrook assessed malaise and fatigue, posttraumatic stress disorder (after your visit),[25] panic disorder without agoraphobia (after your visit),[26] hypersomnia, unspecified; intermittent explosive disorder; and attention deficit hyperactivity disorder, combined type. (Tr. 563.) Dr. Westbrook prescribed Lamictal for Ms. Morro's intermittent explosive disorder. (*Id.*)

On November 6, 2014, Ms. Morro returned to see Dr. Westbrook and reported that the Lamictal had caused diarrhea and that she had stopped taking the medication. (Tr. 558.) She

---

[24] Ms. Morro had previously seen Dr. Westbrook on October 13, 2013, for a consultative exam. (Tr. 275-79.) At that time, Dr. Westbrook diagnosed Ms. Morro with PTSD, major depressive disorder, and panic disorder without agoraphobia. *See* Section III.B.1.b.(1), *infra.*

[25] *See* fn. 26, *supra.*

[26] *Id.*

stated that she didn't feel it helped her for the week she took it and that she had always been high strung.  (*Id.*)  On physical exam, Dr. Westbrook noted that Ms. Morro was healthy-appearing, well-nourished, well-developed, and overweight.  (Tr. 559.)  Dr. Westbrook noted Ms. Morro demonstrated moderate distress.  (*Id.*)  On mental status exam, Dr. Westbrook indicated that Ms. Morro was oriented to time, place, and person; had motoric restlessness; was anxious and depressed; had good eye contact; relevant, logical and coherent speech with normal rate, tone, and volume; normal thought process and associations; adequate language; normal recent and remote memory; and that her fund of knowledge was intact.  (*Id.*)  Dr. Westbrook discontinued Lamictal and prescribed Trileptal.  (Tr. 560.)

On November 17, 2014, Ms. Morro saw Dr. Westbrook and reported that she had been very snappy and angrier with the prescribed medication.  (Tr. 555.)  Ms. Morro said the medication was not working and that she had a "seizure" the previous day and kicked everybody out of her house.  (*Id.*)  Dr. Westbrook's physical and mental exams were consistent with previous visits.  (Tr. 556.)  Ms. Morro requested specific anxiety medication; *i.e.,* Xanax and Benzodiazepine.  (Tr. 545, 557.)  Dr. Westbrook instead increased the Trileptal and added Clonazepam, and educated Ms. Morro about the medications.  (Tr. 557.)  Dr. Westbrook also referred Ms. Morro to Dr. Jeffrey Nelson for treatment of her alleged seizure.[27]  (*Id.*)

On December 2, 2014, Ms. Morro presented to Dr. Westbrook and reported that the prescribed medications were not working and that they only heightened her OCD and made her anxiety worse.  (Tr. 543.)  She told Dr. Westbrook that she took the prescribed medications for two weeks and then stopped.  (*Id.*)  Dr. Westbrook's physical and mental exams were consistent

---

[27] Ms. Morro saw Neurologist Jeffrey Nelson, M.D., on July 23, 2015.  (Tr. 697.)  Dr. Nelson's initial impression was "convulsions, epileptic versus nonepileptic on top of numerous comorbidities."  (*Id.*)  He ordered an EEG study, which was normal (Tr. 698), and a brain MRI which demonstrated nonspecific punctate foci of T2 signal abnormality in the cerebral white matter bilaterally, but was otherwise unremarkable (Tr. 882-83).

with previous visits.  (Tr. 544.)  Dr. Westbrook discontinued all of Ms. Morro's medications and referred her to Carlsbad for services.  (Tr. 545.)  No follow up appointment was made.  (*Id.*)

### (4)     Texas Tech Physicians

On January 9, 2015, Ms. Morro presented to Bennett Boyd, M.D., of Texas Tech Physicians, having been referred for ovarian cysts and pain.  (Tr. 1101.)  Ms. Morro reported lower abdominal/left sided pain for the past three years that often left her debilitated.  (*Id.*)  She reported that birth control pills and codeine provided no relief, but that she used a heating pad to reduce the pain, and that she had "never missed daily activities of life" due to her pain.  (*Id.*)  Ms. Morro reported smoking since age 8, at most ten packs per days, but currently one and a half packs per day.  (*Id.*)  Dr. Boyd's treatment notes indicated that Ms. Morro was in no acute distress, and that her genitourinary exam revealed some external bilateral condyloma.  (Tr. 1103.)  Dr. Boyd planned to obtain an ultrasound to evaluate Ms. Morro's ovaries.[28]  (*Id.*)  On January 13, 2015, Dr. Boyd informed Ms. Morro by letter that her pap smear results showed mild cellular cervical changes likely secondary to HPV.  (Tr. 1112.)  He assured Ms. Morro there was no immediate cervical cancer risk, but that she should be followed up with a colposcopy for additional evaluation.  (Tr. 1112-113.)

On March 11, 2015, Ms. Morro presented for colposcopy. (Tr. 1065-67.)  She was ultimately diagnosed with moderate and severe dysplasia (Tr. 1064), and scheduled for a CKC (cold knife cone) procedure on April 14, 2015.  (Tr. 703-04.)  Ms. Morro experienced some post-op bleeding one week after the CKC procedure, but reported on May 14, 2015, that she had no further bleeding and no pain.  (Tr. 1028.) On July 30, 2015, Ms. Morro returned to Texas Tech Physicians and saw Amy Richards, M.D.  (Tr. 1015-1017.)  She underwent excision of

---

[28] The results of Ms. Morro's pelvic ultrasound demonstrated normal uterus, ovaries, tubes, and kidneys, and no large cysts present.  (Tr. 1084, 1097-98.)

lesions that were determined to be squamous cell carcinoma in-situ and likely related to HPV. (T. 1003-1005.) Ms. Morro was referred to Sarah Hosford, M.D., at Southwest Cancer Center for gynecological care. (*Id.*) On September 17, 2015, Ms. Morro saw Dr. Hosford for evaluation of vulva dysplasia, (Tr. 501-04), and on September 30, 2015, she underwent a partial vulvectomy. (Tr. 510-12.) Ms. Morro was discharged following the surgery without any post-op complications. (Tr. 764-65.)

### (5)  American Medical Group – 2015

Ms. Morro continued to see CFNP Morris throughout 2015 for various health-related issues, including abdominal pain, anxiety, joint/soft tissue pain, upper respiratory infections, headaches, and urinary tract infections. (Tr. 528-30, 585-89, 589-94, 594-99, 607-12, 612-15, 615-18, 619-23, 623-27, 627-31, 631-35, 953-54, 957-61, 961-65, 965-70, 970-75, 975-80, 980-94.) On January 16, 2015, Ms. Morro sought medication for her abdominal pain and reported that her pain was relieved with medication. (Tr. 529.) On March 18, 2015, Ms. Morro sought an increase in pain medication following her colposcopy procedure. (Tr. 618.) On March 26, 2015, Ms. Morro sought a higher dose of Percocet for pain related to her colposcopy procedure. (Tr. 614.) Following Ms. Morro's cold knife cone procedure and vulvectomy, Ms. Morro's complaints of abdominal pain were associated with urinary tract infections. (Tr. 589-94, 965-70, 975-80, 980-84.)

### b.  Relevant Medical Opinion Evidence

### (1)  State Agency Examining Psychological Consultant Marianne Westbrook, Ph.D.

On October 3, 2013, Ms. Morro presented to State agency examining psychological consultant Marianne Westbrook, Ph.D., for a mental status evaluation. (Tr. 275-79.) Ms. Morro alleged mental health problems of multiple personalities, aggression, bad temper, and OCD. (Tr.

275.)  Ms. Morro reported symptoms of sadness, insomnia, poor appetite, poor concentration, fatigue, frustration, aggression, panic attacks, and flashbacks.  (Tr. 276.)  Ms. Morro reported that her aggression had interfered with her work in the past, and that she became unable to work beginning June 2013 because she "cannot handle" being told what to do.  (*Id.*)  Ms. Morro stated she tried to keep busy during the week and that her daily activities included spending time with her aunt, playing computer games (puzzles especially), having meals with her family, taking her son (for whom she does have custody) to school or other functions, cleaning her mother-in-law's house five days a week, and helping take care of her six year old niece when her sister is at work. (*Id.*)  Ms. Morro reported quitting school in the ninth grade when she gave birth to her son. (Tr. 277.)

On mental status exam, Dr. Westbrook observed that (1) Ms. Morro's speech was relevant, logical, and coherent with grossly normal rate, tone, and volume; (2) her thought process appeared to be intact; (3) her mood was anxious and somewhat depressed, although she smiled and laughed easily and interacted in a comfortable manner; (4) she displayed a full range of emotions; (5) she was well oriented; (6) she displayed no evidence of mania; (7) her cognitive functions appeared to be grossly intact; and (8) she displayed limited task persistence.  (Tr. 277-78.)  Dr. Westbrook estimated Ms. Morro's intelligence to be low average and that her judgment was likely to be impulsive and her insight limited.  (Tr. 278.)

Dr. Westbrook's Axis I diagnostic impression was Post Traumatic Stress Disorder; Major Depression Disorder, Recurrent, Moderate; Panic Disorder without Agoraphobia; and rule out Obsessive-Compulsive Disorder.  (Tr. 278.)  Dr. Westbrook assigned a GAF score of 50.[29]

---

[29] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals,

Dr. Westbrook assessed that Ms. Morro was moderately impaired in her ability to (1) understand and remember very short and simple instructions; (2) sustain concentration and persist in (i) carrying out instructions (depending on situation) and (ii) working without supervision (depending on task, as she is able to clean house and provide child-care independently); and (3) adapt to travel to unfamiliar places. (Tr. 278-79.) She assessed that Ms. Morro was moderately to severely impaired in her ability to (1) sustain concentration and persist in attending and concentrating; and (2) adapt to (i) normal hazards and (ii) using public transportation. (*Id.*) Dr. Westbrook assessed that Ms. Morro was severely limited in her ability to (1) understand and remember detailed or complex instructions; (2) interact with the public, coworkers and supervisors; and (3) adapt to changes in the workplace. (*Id.*)

Dr. Westbrook summarized that Ms. Morro reported some information that was difficult to corroborate, but that Ms. Morro was likely to be explosive in many situations, although that does not prevent her from doing house cleaning or providing childcare on a limited basis. (Tr. 279.) Dr. Westbrook observed that more information about Ms. Morro's substance abuse would be useful, and that Ms. Morro's medical doctor should be consulted by DDS to determine to what extent her medical conditions prevent her from gainful employment. (*Id.*)

### (2) State Agency Nonexamining Psychological Consultant Elizabeth Chiang, M.D.

On October 11, 2013, State agency nonexamining psychological consultant Elizabeth Chiang, M.D., reviewed Ms. Morro's medical evidence record. (Tr. 75-81.) Dr. Chiang reviewed Dr. Westbrook's consultative examiner's report, a third-party function report prepared by Ms. Morro's aunt, and the field officer observations. (Tr. 77-78.) Dr. Chiang prepared a PRT and rated Ms. Morro's restriction of activities of daily living as mild; her difficulties in

---

frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* at 34.

maintaining social functioning as moderate; and her difficulties in maintaining concentration, persistence and pace as moderate. (Tr. 76-78.) Dr. Chiang assessed that Ms. Morro had *moderate limitations* in her ability to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) respond appropriately to changes in the work setting; and (9) set realistic goals or make plans independently of others. (Tr. 79-80.) In support of her assessment, Dr. Chiang explained that Dr. Westbrook's opinion was not corroborated by any longitudinal medical evidence, and that Dr. Westbrook had observed on mental status exam that Ms. Morro was cooperative, made appropriate eye contact, interacted in a comfortable manner and laughed easily, and demonstrated no mood swings or aggression during the exam. (Tr. 80.) Dr. Chiang further explained that Ms. Morro's aunt reported that Ms. Morro was social on the computer and phone, had one-on-one contact every day when she felt like it, and reported taking her son to school and school functions. (Tr. 80-81.)

Dr. Chiang concluded that Ms. Morro was able to perform work where interpersonal contact was incidental to the work performed, the complexity of tasks was learned and performed by rote, there were few variables, where little judgment was required, and where the supervision required was simple, direct and concrete. (Tr. 81.) She further concluded that Ms. Morro could "understand, remember, and carry out simple instructions, make simple

decisions, attend and concentrate for 2 hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." (*Id.*)

### (3) State Agency Nonexamining Psychological Consultant Julian Lev, Ph.D.

On June 18, 2014, Dr. Lev reviewed Ms. Morro's medical evidence record at reconsideration. (Tr. 91-97.) Dr. Lev noted that Ms. Morro only reported at reconsideration more difficulty with functioning due to her physical impairment, and that there was no other evidence of mental health impairment provided. (Tr. 94.) Dr. Lev further noted that she reviewed all available evidence and that Dr. Chiang's discussion and write-up were confirmed as accurate and supported by evidence. (Tr. 97.)

### 2. The ALJ Properly Evaluated Ms. Morro's Relevant Medical Evidence

The regulations provide that all evidence in a claimant's case record will be considered when making a determination or decision whether a claimant is disabled. 20 C.F.R. § 920(a)(3); *see also Ray v. Bowen, 865 F.2d 222, 226 (10th Cir. 1989)* ("[t]he ALJ must determine the claimant's eligibility for disability benefits in light of the entire record"); *Herbert v. Heckler*, 783 F.2d 128, 130 (8th Cir. 1986) (it is insufficient that there are inconsistencies in objective medical evidence to support the Secretary's denial of benefits, "[t]he Secretary must demonstrate that she *evaluated all* the evidence").

Ms. Morro's argument that the ALJ "overlooked the medical opinions, provided in the record, regarding the severity and pain associated with [her] ovarian cysts" (Doc. 20 at 7) is misplaced because none of Ms. Morro's various healthcare providers rendered such medical opinions.

> Medical opinions are statements from an acceptable medical source that reflect judgments about the nature and severity of [a claimant's] impairments, including

[a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions.

20 C.F.R. 416.927(a)(1).[30]  Ms. Morro points to certain evidence wherein she complained of severe pain (Doc. 20 at 8-9), however, the Court has found no *medical opinions* in the record regarding the severity and pain associated with Ms. Morro's cysts, and the record clearly establishes that the ALJ thoroughly reviewed and evaluated all the medical record evidence related to Ms. Morro's cysts during the relevant time period.  In discussing this evidence, the ALJ concluded that:

> [t]he record documents a history of abdominal pain due to the claimant's ovarian cysts (2F, 3F, 4F, 5F, 6F, 8F, 9F, 10F, 13F, 14F, 16F, 18F).  However, the objective record does not support greater physical limitations that those outlined in the residual functional capacity above.  The claimant's treatment has been essentially conservative, and the physical exams have generally been relatively benign (2F, 3F, 4F, 5F, 6F, 8F, 9F, 10F, 13F, 14F, 16F, 18F).

(Tr. 26.)  Although the ALJ did not discuss Ms. Morro's treatment history related to her cysts record-by-record, the Court's careful and meticulous review of the record, demonstrates that the ALJ's findings regarding Ms. Morro's treatment history and the generally benign nature of her physical exams related to her ovarian cysts are supported by substantial evidence.  *See* Section III.B.1.a., *supra*.  Moreover, the State agency nonexamining medical consultants determined that Ms. Morro's alleged physical impairments were non-severe and provided no assessment limiting her ability to do work-related physical activities.[31]  The ALJ, however, having the benefit of all

---

[30] For all claims filed on or *after* March 27, 2017, 20 C.F.R. § 404.1527 was rescinded and replaced with 20 C.F.R. § 404.1520c.  82 Fed. Reg. 5844, 5869.  Further, the Social Security Administration rescinded SSR 96-2p effective March 27, 2017, to the extent it is inconsistent with or duplicative of final rules promulgated related to Giving Controlling Weight to Treating Source Medical Opinions found in 20 C.F.R. § 404.1527.  82 Fed. Reg. 5844, 5845.

[31] On October 29, 2013, State agency nonexamining medical consultant John Pataki, M.D., reviewed Ms. Morro's medical records and summarized that Ms. Morro's alleged pancreatitis was ruled out as a diagnosis, that her seizures occurred during alcohol withdrawal, and that as long as Ms. Morro stayed compliant with her treatment of right ovary cyst her symptoms should resolve and be non-severe 12 months after onset.  (Tr. 75-76.)  On June 6, 2014, State agency nonexamining consultant Karen Schnute, M.D., reviewed Ms. Morro's medical records at reconsideration and concluded that Ms. Morro's seizures were non-severe; her ovarian cysts did not pose more than

of Ms. Morro's medical evidence record, limited Ms. Morro to light work. (Tr. 25.) The ALJ then ultimately relied on two *sedentary* level jobs that she could perform in the national economy to determine that she was not disabled. The ALJ, therefore, tempered his findings to Ms. Morro's benefit. *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit).

To the extent that Ms. Morro's argument asks the Court to reweigh the evidence, it will not do so. *See Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007) ("We review only the sufficiency of the evidence, not its weight . . . . Although the evidence may also have supported contrary findings, we may not displace the agency's choice between two fairly conflicting views . . . ."). Because the ALJ correctly applied the law and his evaluation of the medical evidence record related to Ms. Morro's ovarian cysts is supported by substantial evidence, there is no reversible error as to this issue.

### 3. The ALJ Properly Evaluated Dr. Westbrook's Medical Opinion

Ms. Morro argues that the reasons the ALJ cited for according Dr. Westbrook's medical opinion only some weight are not supported by the medical evidence in the record. (Doc. 20 at 10.) Ms. Morro explains that her family history and social difficulties as reported to Dr. Westbrook were similarly reported in 2008 records from Guidance Center of Lea County, and therefore support according more weight to Dr. Westbrook's assessed limitations. (*Id.*) The Commissioner contends that the ALJ properly evaluated Dr. Westbrook's opinion because he found that Dr. Westbrook's mental status exam findings were relatively normal, the only treatment during the relevant period of time was in the form of medication, and mental status exams performed for CFNP Morris were consistently normal. (Doc. 22 at 12-13.) The

a non-severe limitation in function; and there was no evidence of limitation of function due to heart or liver problems. (Tr. 91-92.)

Commissioner further contends that any alleged failure of the ALJ to rely on evidence outside of the relevant time period is not grounds for remand. (*Id.* at 13.)

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215. Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996 WL 374183 at *5.[32] "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[33] An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

The ALJ provided appropriate explanations for the weight he accorded Dr. Westbrook's consultative examiner opinion and his findings are supported by substantial evidence. The ALJ accorded Dr. Westbrook's opinion some weight and explained that the medical record evidence

---

[32] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

[33] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

as a whole and Dr. Westbrook's examinations notes supported the moderate social and concentration limitations she opined, but that they did not support the severe limitations she assessed. (Tr. 26.) These are appropriate reasons for discounting a medical source opinion. *See* 20 C.F.R. 416.927(c)(3) and (4) (explaining that the more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, and the more consistent a medical opinion is with the record as a whole, the more weight will be accorded).

Further, the ALJ's finding that the medical record evidence as a whole did not support the severe limitations Dr. Westbrook assessed is supported by substantial evidence. Prior to seeing Dr. Westbrook, the only record evidence of Ms. Morro's mental impairments consisted of records outside the relevant period of time from Guidance Center of Lea County, Inc. (Tr. 824-30.) "Evidence outside the relevant time period may be considered to the extent that it assists the ALJ in determining disability during the relevant time period." *Overstreet v. Astrue*, 2012 WL 996608, at *9 (N.D. Okla. Mar. 23, 2012) (unpublished) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)). Ms. Morro argues that the 2008 Guidance Center records corroborate her family history and social difficulties as she reported to Dr. Westbrook. (Doc. 20 at 10.) However, Ms. Morro fails to explain how the 2008 records, generated five years *before* her alleged onset date, demonstrate that her mental health impairments rendered her disabled during the relevant time period. To the contrary, the 2008 records, although documenting Ms. Morro's reported history of sexual, physical, and emotional abuse, indicate a diagnostic impression/conclusion that Ms. Morro "seems motivated to be a nurturing mother to her son, and to raise him in a healthy emotional environment. Client denies using drugs or alcohol. Her

SASSI[34] results indicate 'low probability of substance dependence.'" (Tr. 830.) The medical record does not contain evidence of any treatment that followed Ms. Morro's 2008 intake assessment.

Evidence of specific treatment for Ms. Morro's mental impairments during the relevant time period is sparse. After seeing Dr. Westbrook for a consultative exam on October 3, 2013, Ms. Morro did not seek care related to her mental impairments for a full year. In doing so, she returned to Dr. Westbrook, who saw her four times from October 29, 2014 through December 2, 2014. (Tr. 543-45, 555-57, 558-60, 560-63.) At each of those four visits, Dr. Westbrook's mental status exams, but for noting some motoric restlessness and anxious and depressed mood, were essentially normal. (Tr. 544, 556, 559, 562.) Further, although Dr. Westbrook initiated treatment with prescribed medications for Ms. Morro's intermittent explosive disorder, Ms. Morro either had difficulty with and/or discontinued the various prescribed medications at will, such that on December 2, 2014, Dr. Westbrook discontinued all medications and referred to Carlsbad for any future mental health services. There is no medical record evidence that Ms. Morro followed up on Dr. Westbrook's referral or sought mental health care elsewhere.

Medical record evidence from 2015, as the ALJ noted (Tr. 26), demonstrates that CFNP Morris noted essentially normal mental status exams throughout the entire year. (Tr. 588, 593, 630, 657, 665, 670, 674, 678, 682, 686, 956, 960, 969, 974, 979, 984.) CFNP Morris prescribed various medications to treat Ms. Morro's anxiety during this time, including Sertraline, Diazepam and Alprazolam. (Tr. 604, 633, 961.) On November 14, 2015, CFNP Morris noted that Ms. Morro's anxiety was well controlled with Alprazolam. (Tr. 960.)

The ALJ's finding that Dr. Westbrook's examination notes did not support the severe limitations she opined is also supported by substantial evidence. (Tr. 26.) Psychological

---

[34] Substance Abuse Subtle Screening Inventory

opinions may rest either on observed signs and symptoms or on psychological tests. *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *see also Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2015) (unpublished) (explaining that when an ALJ finds a claimant not credible, the ALJ may discount a psychological examiner's findings to the extent they rely on a claimant's self-reporting). Here, Dr. Westbrook did not administer any psychological tests during her consultative exam. Further, the ALJ discussed Dr. Westbrook's observations based on her mental status exam, and determined that her notes supported only moderate social and concentration limitations, and incorporated those limitations in his mental RFC assessment. (Tr. 26.) The Court finds no error in the ALJ's analysis. To the extent the ALJ discounted certain of Dr. Westbrook's findings because he determined they relied on Ms. Morro's subjective self-reporting, he could properly do so having found Ms. Morro not credible.

For the foregoing reasons, the Court finds that the ALJ provided appropriate explanations for the weight he accorded Dr. Westbrook's opinion and that his explanations are supported by substantial evidence. As such, there is no reversible error as to this issue.

### 4.    Credibility Assessment

Finally, Ms. Morro argues that the ALJ failed to address the measures Ms. Morro took to alleviate her long history of ongoing pain when he found her statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. (Doc. 20 at 11.) The Commissioner contends that the ALJ considered whether the record as a whole was consistent with Ms. Morro's allegations of disabling symptoms, and whether her subjective reports were supported by the medical evidence, and for valid reasons determined that her allegations of disabling symptoms were not consistent with the record as a whole. (Doc. 22 at 8-11.)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)). Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 16-3p, 2016 WL 1119029, at *9 ("it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'"); *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993) (in determining the credibility of pain testimony, the ALJ should consider the extensiveness of the attempts to obtain relief, the frequency of medical contacts, the nature of daily activities, and the consistency or compatibility of nonmedical testimony with objective medical evidence).

Here, the ALJ's credibility findings are closely and affirmatively linked to substantial evidence. The ALJ found that despite Ms. Morro's allegedly disabling impairments, Ms. Morro engaged in a somewhat normal level of daily activity and interaction. (Tr. 27.) The ALJ discussed Ms. Morro's testimony about her daily activities, and as she reported them in her Adult Function Report and to Dr. Westbrook, and as reported by her aunt in the Third-Party Adult Function Report. (Tr. 23-26.) The ALJ specifically noted that Ms. Morro reported and/or testified about spending time with her aunt and family, playing computer games (puzzles especially), eating with her family, taking her son to school and school functions, helping take care of her six year old niece, performing chores around her house, and cleaning her mother-in-law's house five days each week. (*Id.*) The record supports these findings. (Tr. 47-49, 191-95, 231-34, 276-77.) The record also demonstrates that Ms. Morro testified she does laundry, could

vacuum if she had to, cares for her dog, has no difficulty driving, provides transportation for her aunt as needed, and drives by herself to take her dog to the lake or to pick up food.  (Tr. 47-49.)  The Court's review of the record shows that Ms. Morro also reported to Dr. Westbrook that she enjoys drawing, crocheting, cross stitching, watching television, and visiting with friends and family.  (Tr. 277.)  Ms. Morro reported in her Adult Function Report she takes care of a cat, irons, drives a truck, shops in stores for food and personal items, pays bills, does word search, regularly goes to the library and to parks, and can walk 4.3 miles before having to rest.  (Tr. 231-34.)  Ms. Morro also reported to Dr. Boyd of Texas Tech Physicians that she had never missed daily activities of life due to her pain.  (Tr. 1101.)  In addition to citing Ms. Morro's activities of daily living, the ALJ also discussed the objective medical evidence which supported his finding that Ms. Morro's history of treatment for abdominal pain due to ovarian cysts, albeit extensive, was essentially conservative and the associated physical exams were relatively benign.   The record supports this finding.  *See* Section III.B.2., *supra*.  *See Bainbridge v. Colvin*, 618 F. App'x 384, 387 (10th Cir. 2015) (unpublished) (finding that the ALJ did not err in his credibility finding where even though claimant was seen 28 times in less than two years for respiratory ailments, his treatment was conservative, thereby concluding that frequency says little about the intensity of treatment).

For the foregoing reasons, the Court finds the ALJ's findings concerning the intensity, persistence, and limiting effects of her symptoms are closely and affirmatively linked to substantial evidence.  As such, there is no reversible error as to this issue.

## IV.  Conclusion

For the reasons stated above, Ms. Morro's Motion to Reverse and Remand Administrative Agency Decision (Doc. 19) is **DENIED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**